IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| **JAMES ALLEN POLLARD** | ) | |
| **#451241,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | **NO.  3:20-00017** |
| **v.** | ) | |
| | ) | **JUDGE CAMPBELL** |
| **WARDEN MIKE PARRIS,** | ) | |
| | ) | |
| **Respondent** | ) | |

## MEMORANDUM

Petitioner is a state inmate serving an effective sentence of life for first-degree murder and especially aggravated robbery.  He filed a pro se petition for the writ of habeas corpus under 28 U.S.C. § 2254 in the United States District Court for the Eastern District of Tennessee, which transferred the case to this Court pursuant to the courts' consistent practice of reviewing habeas petitions in the district of conviction.  The Court will deny his petition for the reasons set forth below.

## I.      BACKGROUND AND PROCEDURAL HISTORY

On February 12, 2009, a Davidson County jury convicted Petitioner of one count of first-degree felony murder, one count of first-degree premeditated murder, and one count of especially aggravated robbery. (Doc. No. 15-1 at 124–26.)  The trial court merged the two murder counts and sentenced Petitioner to life in prison for the murder. (*Id*. at 124–25.)  The court sentenced Petitioner to 18 years in prison for the robbery count and ordered the two sentences to run consecutively for a total effective sentence of life plus 18 years. (*Id.* at 126.)

On direct appeal, the Tennessee Court of Criminal Appeals affirmed Petitioner's convictions and individual sentences but found that the trial court had failed to make the required

factual findings on the record to support consecutive sentencing and remanded for a new sentencing hearing. (Doc. No. 15-19.) Both sides moved for permission to appeal to the Tennessee Supreme Court. (Doc. Nos. 15-21, 15-22.) The state supreme court granted the state's appeal and denied Petitioner's appeal. (Doc. No. 15-23.) The court went on to agree with the lower appellate court that the trial court had failed to consider factors required to support consecutive sentencing, affirmed the lower court's ruling, and remanded for new sentencing. (Doc. No. 15-27.) On February 7, 2014, the trial court entered amended judgments ordering that Petitioner's sentences of life and 18 years would run concurrently, for an effective total sentence of life in prison. (Doc. No. 15-29 at 27–29.)

Petitioner, through counsel, filed a petition for post-conviction relief in the state trial court on December 2, 2014. (Doc. No. 15-29 at 30.) After an evidentiary hearing and briefing by the parties, the court denied relief on July 27, 2017. (*Id.* at 121–25.) The Tennessee Court of Criminal Appeals affirmed on November 8, 2018. (Doc. No. 15-55.)

Petitioner's pending federal habeas petition was received by the United States District Court for the Eastern District of Tennessee on February 9, 2019, and Respondent does not contest its timeliness. (Doc. No. 1 at 19; Doc. No. 16.) Respondent has filed an answer opposing the petition along with relevant portions of the state court record. (Doc. Nos. 15, 16, 19.) Petitioner has elected not to file an optional reply, despite the Court's sua sponte extension of the deadline for him to do so. (*See* Doc. No. 25.) This matter is thus deemed fully briefed and ripe for review.

## II. STATEMENT OF FACTS

The Tennessee Supreme Court succinctly summarized the case on direct appeal:

At approximately 11:26 a.m. on March 24, 2006, officers of the Metropolitan Police Department of Nashville and Davidson County responded to a 911 report of a shooting at 301 North Eighth Street. Upon their arrival, they found the body of twenty-five-year-old Jamil Branhan (the "victim") lying on the living room floor

2

of his apartment with two gunshot wounds to his head. There was no evidence of a forced entry.

During their investigation, Detectives Jeff Wiser and Michael Windsor traced the victim's last accepted phone call to Lakeisha Hooten. Describing her as "a person of interest," the detectives interviewed her on five separate occasions over a period of months. Initially, Ms. Hooten implicated two individuals by name, both of whom were eliminated as suspects upon further inquiry. During her fifth interview, however, she "finally broke down," informing the detectives that her boyfriend, James Allen Pollard (the "Defendant"), was involved in the incident.

The detectives conducted a video-recorded interview with the Defendant. After being informed of and waiving his *Miranda* rights, the Defendant stated that on the night of the shooting Ms. Hooten had arranged for him to meet the victim at his apartment to purchase a "dime sack" [FN: A "dime sack" refers to the amount of marijuana that can be purchased for ten dollars. Merriam-Webster, http://merriam-sebster.com/dictionary/dime (last visited Dec. 13, 2013). The Defendant described this amount as two grams.] of marijuana, as he had done on prior occasions. Admitting that he had a .38 caliber firearm in his pocket when he arrived at the apartment, the Defendant claimed that the victim was "gone on something," got "spooked" when he saw the Defendant's weapon, and, at that point, retrieved his own gun, a nine-millimeter semi-automatic. The Defendant told the officers that he drew his gun, and, during a struggle with the victim, his gun discharged. He acknowledged that he shot a second time, claiming that he did so when the victim raised his arm and pointed the semi-automatic in his direction. The Defendant also asserted that the victim fired his own gun once during the episode. After initially denying to Detectives Wiser and Windsor that he had "take[n] anything," the Defendant eventually admitted that after he shot the victim he took his weapon and his PlayStation.

The Defendant was charged and arrested. Later, the Davidson County Grand Jury indicted the Defendant on three counts: (1) felony murder; (2) premeditated murder; and (3) especially aggravated robbery.

At trial, the State presented the Defendant's video-recorded statement as evidence. Other testimony offered by the State established that the victim's mother, Marilyn Branhan, had become concerned after not being able to contact her son and had asked the apartment manager to check inside his unit. The apartment staff discovered the body, the police were notified, and several items were found missing from her son's apartment, including his PlayStation, gun, keys, and cell phone. An empty gun holster was found in a bin inside the bedroom.

Officers determined that the victim suffered two gunshot wounds, one to the chin and one to the temple. No shell casings were found in the apartment, and no bullet holes were found in the walls. Further testimony established that the victim's nine-millimeter semiautomatic would have ejected shells if fired. A forensic scientist with the Tennessee Bureau of Investigation concluded that the bullets causing the death of the victim were .38 caliber, typically fired from a revolver rather than a semi-automatic pistol.

A search of the apartment did not yield any evidence indicating that the victim had been dealing illegal drugs. Other witnesses, including the victim's girlfriend, Reshena Barnes, and a co-worker, Rose Reese, testified that the victim, who was employed at AutoZone, did not sell drugs.

Anthony Bowers, a federal inmate who had shared a cell with the Defendant, testified that the Defendant informed him that his girlfriend had arranged a meeting with the victim so that the Defendant could "rob him for some marijuana." According to Bowers, the Defendant claimed that he drew his revolver after the victim became suspicious and that, when the victim struggled and attempted to arm himself, the Defendant shot the victim in the head. Bowers stated that the Defendant admitted taking some marijuana, a cell phone, and a pistol from the apartment, and he also admitted shooting the victim a second time to ensure that he would not be identified. The Defendant explained to Bowers that he had been arrested only because his girlfriend "broke down" and told the investigating detectives the truth; he further recommended to Bowers that using a revolver was the better practice in a killing because it did not leave shell casings.

The forensic pathologist who performed the autopsy concluded that one of the bullets entered the left side of the victim's chin, breaking his chin and lacerating his tongue, causing him to swallow a moderate amount of blood. More blood was found in his lungs, indicating that the victim was still alive after this shot. A second bullet, fired within six inches, entered the victim's left temple, fracturing the brain and portions of the brain stem, rendering the victim immediately unconscious. The victim's body contained minimal levels of marijuana and had a blood alcohol content of .04.

Although the Defendant chose not to testify, three witnesses described him as a "good kid," a hard worker at his full-time job, and a reliable person.

(Doc. No. 15-27 at 24.)

### III.    ISSUES PRESENTED FOR REVIEW

The petition asserts seven claims for relief:

1. The prosecution failed to disclose impeachment evidence pertaining to state's witness Anthony Bowers, in violation of Petitioner's due process rights under *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and *Napue v. Illinois*, 360 U.S. 264 (1959). (Doc. No. 1 at 6.)

2. Petitioner's trial counsel was ineffective for failing to investigate and discover publicly available impeachment evidence pertaining to Bowers. (*Id.* at 8.)

3. Petitioner's trial counsel was ineffective for failing to accept the prosecutor's offer of open-file discovery and to discover the impeachment evidence pertaining to Bowers in the prosecutor's file. (*Id.* at 9.)

4. Petitioner's trial counsel was ineffective for failing to impeach or challenge Bowers's

4

testimony and for bolstering Bowers's credibility. (*Id.* at 11.)

5. Petitioner's trial counsel was ineffective for failing to present proof at the suppression hearing necessary to suppress Petitioner's confession. (*Id.* at 12.)

6. The cumulative effect of trial counsel's ineffective assistance resulted in denial of a fundamentally fair trial. (*Id.* at 12.)

7. Petitioner's confession was obtained in violation of his Fifth and Fourteenth Amendment rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). (*Id.* at 13.)

## IV.    STANDARD OF REVIEW

The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). A federal court may grant habeas relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Upon finding a constitutional error on habeas corpus review, a federal court may only grant relief if it finds that the error "had substantial and injurious effect or influence" on the outcome of the case. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *Peterson v. Warren*, 311 F. App'x 798, 803–04 (6th Cir. 2009).

AEDPA was enacted "to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases . . . and 'to further the principles of comity, finality, and federalism.'" *Woodford v. Garceau*, 538 U.S. 202, 206 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 436 (2000)). AEDPA's requirements "create an independent, high standard to be met before a federal court may issue a writ of habeas corpus to set aside state-court rulings." *Uttecht v. Brown*, 551 U.S. 1, 10 (2007) (citations omitted). As the Supreme Court has explained, AEDPA's requirements reflect "the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 562 U.S. 86, 102–03 (2011) (quoting *Jackson v. Virginia*,

5

443 U.S. 307, 332 n.5 (1979)).  Where state courts have ruled on a claim, AEDPA imposes "a substantially higher threshold" for obtaining relief than a de novo review of whether the state court's determination was incorrect. *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410).

Specifically, a federal court may not grant habeas relief on a claim rejected on the merits in state court unless the state decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1) and (d)(2).  A state court's legal decision is "contrary to" clearly established federal law under Section 2254(d)(1) "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. at 412–13.  An "unreasonable application" occurs when "the state court identifies the correct legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.  A state court decision is not unreasonable under this standard simply because the federal court finds it erroneous or incorrect. *Id.* at 411.  Rather, the federal court must determine that the state court's decision applies federal law in an objectively unreasonable manner. *Id.* at 410–12.

Similarly, a district court on habeas review may not find a state court factual determination to be unreasonable under Section 2254(d)(2) simply because it disagrees with the determination; rather, the determination must be "'objectively unreasonable' in light of the evidence presented in the state court proceedings.'" *Young v. Hofbauer*, 52 F. App'x 234, 236 (6th Cir. 2002).  "A state court decision involves 'an unreasonable determination of the facts in light of the evidence

6

presented in the State court proceeding' only if it is shown that the state court's presumptively correct factual findings are rebutted by 'clear and convincing evidence' and do not have support in the record." *Matthews v. Ishee*, 486 F.3d 883, 889 (6th Cir. 2007) (quoting § 2254(d)(2) and (e)(1)); *but see McMullan v. Booker*, 761 F.3d 662, 670 and n.3 (6th Cir. 2014) (observing that the Supreme Court has not clarified the relationship between (d)(2) and (e)(1) and the panel did not read *Matthews* to take a clear position on a circuit split about whether clear and convincing rebutting evidence is required for a petitioner to survive (d)(2)). Moreover, under Section 2254(d)(2), "it is not enough for the petitioner to show some unreasonable determination of fact; rather, the petitioner must show that the resulting state court decision was 'based on' that unreasonable determination." *Rice v. White*, 660 F.3d 242, 250 (6th Cir. 2011).

Thus the standard set forth in 28 U.S.C. § 2254(d) for granting relief on a claim rejected on the merits by a state court "is a 'difficult to meet' and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt.'" *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (quoting *Harrington*, 562 U.S. at 102, and *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)). Petitioner carries the burden of proof. *Pinholster*, 563 U.S. at 181.

## V.     ANALYSIS AND DISCUSSION

### A. Claim 1 — Suppression of Impeachment Evidence

As reflected above in the Tennessee Supreme Court's summary of the case, Petitioner's former cellmate, Anthony Bowers, testified at trial to the effect that Petitioner had confessed to him about the murder and robbery. Petitioner alleges that the prosecution failed to disclose evidence that could have been used to impeach Bowers, including: (1) Bowers was seeking a reduction in his federal sentence based on his testimony against Petitioner; (2) Bowers had sought

7

and received sentence reductions in the past for cooperation against other defendants; (3) Bowers claimed that at least six cellmates, including Petitioner, had "strangely" confessed to him; and (4) Bowers had been accused of attacking another inmate. (Doc. No. 1 at 6.)

Petitioner exhausted this claim on direct appeal after failing to obtain a new trial based on the testimony of trial counsel and the prosecutor presented at the hearing on his motion for new trial. The Tennessee Court of Criminal Appeals summarized that testimony:

> At the hearing on Defendant's motion for new trial, the Assistant District Attorney General Deborah Housel, who prosecuted Defendant's case, testified that on January 5, 2007, in response to a discovery request from Defendant, she reported that there was no exculpatory evidence known to the prosecution at that time. In a letter dated January 29, 2009, General Housel notified defense counsel of four additional witnesses, including "Anthony Bowers (federal inmate)," which the State intended to call at trial. She also prepared and filed a writ of habeas corpus ad testificandum in order to have Mr. Bowers transported to Defendant's trial scheduled for February 9, 2009, and she faxed a copy to defense counsel.
>
> General Housel testified that she called defense counsel on February 2, 2009, and "had a long and lengthy discussion." She told defense counsel that Mr. Bowers' attorney had contacted her and told her that Mr. Bowers had "information regarding admissions that were made by [Defendant] to him." General Housel also told defense counsel that she had interviewed Mr. Bowers along with Detective Windsor, and that the State had initially elected not to use Mr. Bowers' testimony at Defendant's trial because Mr. Bowers had been accused of raping another inmate. However, General Housel also told defense counsel on February 2, 2009, that Mr. Bowers had since "been cleared of all wrongdoing concerning [the rape allegation]," and that the State intended to have Mr. Bowers brought to court, although she "had no clue whether or not he was going to testify for [the State] or not." General Housel testified, however, that in light of the strength of the State's case against Defendant, she did not believe she needed to call Mr. Bowers as a witness. General Housel invited defense counsel to "feel free to come by, look at all the file, and the letter [written to General Housel by Mr. Bowers], and all the information regarding the rape." General Housel recalled that defense counsel "came over to [her] office one day and [she] gave him the box with all the information in it." She testified that she showed defense counsel the letter from Mr. Bowers.
>
> General Housel testified that she met with defense counsel again on February 6, 2009, and she "brought the entire file for [defense counsel] to look through. [She] opened it, showed him everything" and gave defense counsel the opportunity to make copies of the file, which included the letter from Mr. Bowers and information regarding the rape allegation and investigation. General Housel testified she was "one hundred percent positive that [she] went into great detail with [defense

counsel], all of the allegations that were made and the letter [Mr. Bowers] sent [her]."

General House testified that she believed that Mr. Bowers "was going to get consideration for his testimony," but that she did not know what relief, if any, he received in federal court. She testified that she did not tell defense counsel that Mr. Bowers was eligible for a sentence reduction in exchange for his testimony "because [she didn't] know that that's true." She told defense counsel that all she could do for Mr. Bowers was "put in a good word" for him to Assistant United States Attorney Blanche Cook, who was assigned to Mr. Bowers' case. General Housel acknowledged that she sent an email to Ms. Cook following Defendant's trial, advising Ms. Cook that Mr. Bowers "did a fabulous job" and General Housel wrote, "I know I can't help Mr. Bowers but if I could, I would certainly give him any consideration and break I could. He provided crucial testimony."

General Housel testified that she met with Mr. Bowers on November 30, 2007. Another Assistant District Attorney, Katie Miller, accompanied her to that meeting to discuss a case in which Mr. Bowers offered some information. Ms. Housel did not know of any other cases in which Mr. Bowers had provided assistance to the prosecution. Ms. Housel testified that Mr. Bowers "was not a possible witness until [she] found out that he had been cleared of the rape allegation."

Attorney Jack Seaman testified that he represented Mr. Bowers in federal court at a hearing on a "Rule 35" motion to reduce Mr. Bowers' sentence in 2008, prior to Mr. Bowers having testified at Defendant's trial. Mr. Seaman explained that a Rule 35 motion is filed by the government in order to seek a reduction in a defendant's sentence based on assistance he provided to the government. In Mr. Bowers' case, the motion was denied. Mr. Seaman testified that he represented to the federal court that Mr. Bowers "provided information and assistance regarding at least five people that got convicted" and in one case in which the defendant pled guilty, and that Mr. Bowers "provided assistance in the prosecution of a couple of people but he [was] not called as a trial witness." At the time of Mr. Bowers' resentencing hearing, Mr. Seaman did not believe that Mr. Bowers would be called as a witness in Defendant's case "because of accusations he was involved in a gang rape."

On cross-examination, Mr. Seaman testified that he contacted General Housel "[m]ultiple times" to offer Mr. Bowers' assistance in Defendant's case, and Ms. Housel advised that the State was not interested in Mr. Bowers' testimony "because the case was so strong." Mr. Seaman recalled a conversation with General Housel after Mr. Bowers was accused of rape in which General Housel advised Mr. Seaman that she was "absolutely" not going to call Mr. Bowers to testify. Mr. Seaman acknowledged that General Housel contacted him in January, 2009, to inquire about the rape allegation, and Mr. Seaman informed her that the rape allegation was false. General Housel then asked Mr. Seaman to find out whether Mr. Bowers would still testify, and Mr. Seaman was doubtful that Mr. Bowers would testify because he had already had his resentencing hearing. Mr. Seaman testified that Mr. Bowers did not benefit from his testimony in Defendant's case. Mr. Seaman also testified that he did not inform General Housel about other cases in which Mr. Bowers provided assistance.

9

Attorney Edward Gross, Defendant's trial counsel, testified that he became aware of Anthony Bowers on January 30, 2009, when he received a fax from General Housel that listed four additional potential State's witnesses. Mr. Gross testified that in a "subsequent conversation," General Housel disclosed that Mr. Bowers' testimony was regarding a "jailhouse confession" and that there had been "a rape case against Bowers but he was exonerated on that." General Housel stated that she was unsure whether Mr. Bowers would be called to testify. Mr. Gross testified that if he had more time, he "would have done everything [he] could to have tried to follow up on this." Mr. Gross acknowledged that General Housel had "been very open and very forthcoming, as she always is in every case" and that she had offered for Mr. Gross to copy her file which was "probably eight to nine inches thick." He testified that General Housel told him that her file was "basically the same as [his]," and Mr. Gross did not look through the file, although he did not think that General Housel "would have objected had [he] gone through it line by line, sheet by sheet."

Mr. Gross testified that he was not made aware of the letter from Mr. Bowers to General Housel; however, on cross-examination, he acknowledged that General Housel told him that she had received a letter from Mr. Bowers and that he remembered General Housel "paraphrasing the contents of the letter." Mr. Gross testified, "General Housel and I had spoken pretty regularly about Bowers, and – even to the fact that she didn't know whether he would testify[.]" Mr. Gross testified that he listened to the audiotape of General Housel's interview with Mr. Bowers on the morning before Mr. Bowers testified. Mr. Gross was aware of the allegations against Mr. Bowers and that "he had been cleared." However, Mr. Gross was "not aware, or made aware, of the factual basis" for the allegation, and had he known, he would have cross-examined Mr. Bowers about it. Mr. Gross testified, "I would have used anything I could have to have shown any possible motive on his behalf other than the goodness of his heart."

Mr. Gross was not aware that Mr. Bowers had provided assistance in any prosecutions other than the one in which Assistant District Attorney Katie Miller also met with Mr. Bowers with General Housel present. Mr. Gross testified that he "distinctly remembered" General Housel telling him that "there was nothing that [she] could do to help [Mr. Bowers]." Mr. Gross testified, "General, in my opinion you told me – you disclosed everything that you knew." Mr. Gross testified that he believed that "the most damning testimony" was that of the medical examiner and the firearms expert. He testified, "I would say these two coupled together were the things that we just weren't able to overcome."

(Doc. No. 15-19 at 6–9.)

The state court then went on to evaluate Petitioner's claim on the merits:

Defendant asserts that the prosecution violated his due process right to a fair trial by failing to disclose significant impeachment evidence regarding the State's witness Anthony Bowers. Defendant contends that the State should have produced information related to Mr. Bowers' credibility, specifically, information that he had provided favorable testimony in other cases and information regarding his

involvement in an alleged prison rape. Defendant also alleges that the State did not disclose that Anthony Bowers would testify against Defendant until "the very eve of trial." The State responds that Defendant has failed to establish that the State purposefully withheld information from Defendant, and the State further asserts that even if the information alleged by Defendant to have been withheld was provided, Defendant has failed to show that it would have affected the outcome of the trial. We agree with the State.

In *Brady v. Maryland*, the United States Supreme Court held that the prosecutor has a duty to furnish exculpatory evidence to the defendant. 373 U.S. at 87. Exculpatory evidence may pertain to the guilt or innocence of the accused and/or the punishment which may be imposed if the accused is convicted of the crime. *State v. Marshall*, 845 S.W.2d 228 (Tenn. Crim. App. 1992). The Supreme Court in *Brady* reasoned that a fair trial and a just result could not be obtained when, at the time of trial, the prosecution suppressed information favorable to the accused. *Brady*, 373 U.S. at 87–88.

Any "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. Information useful for impeaching a witness is considered favorable information that the prosecutor may not withhold. *Giglio v. U.S.*, 405 U.S. 150 (1972). And, while *Brady* does not require the State to investigate for the defendant, it does burden the prosecution with the responsibility of disclosing statements of witnesses favorable to the defense. *State v. Reynolds*, 671 S.W.2d 854, 856 (Tenn. Crim. App. 1984). The duty does not extend to information that the defense already possesses or is able to obtain or to information not in the possession or control of the prosecution. *Banks v. State*, 556 S.W.2d 88, 90 (Tenn. Crim. App. 1977).

Before this court may find a due process violation under *Brady*, the following elements must be established:

1. The defendant must have requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information, whether requested or not);

2. The State must have suppressed the information;

3. The information must have been favorable to the accused; and

4. The information must have been material.

*State v. Edgin*, 902 S.W.2d 387, 389 (Tenn. 1995). The burden of proving a *Brady* violation rests with the defendant, and the violation must be proven by a preponderance of the evidence. *Id.* When determining the materiality of undisclosed information, a reviewing court must establish whether "in [the] absence [of the information, the defendant] received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). In other words, evidence is considered material only if there is a reasonable probability that had the evidence been disclosed to the defense, the

results of the proceeding would have been different. *Id.* at 433-34 (quoting *U.S. v. Bagley*, 473 U.S. 667, 682 (1985).

Furthermore, in situations where there was only a delayed disclosure of exculpatory information, in contrast to a complete failure to disclose exculpatory information, *Brady* does not apply, unless the delay itself causes prejudice. *See State v. Caughron*, 855 S.W.2d 526, 548 (Tenn. 1993).

The prosecution notified Defendant of its intent to call Mr. Bowers as a "potential" witness on January 29, 2009, eleven days prior to trial. On February 2, 2009, the prosecution disclosed to defense counsel that: (1) Mr. Bowers' attorney, Jack Seaman, had notified the prosecution that Defendant made admissions to Mr. Bowers while the two men were incarcerated together; (2) that the prosecutor had spoken to Mr. Bowers and initially decided not to use him as a witness for the State because Mr. Bowers had been accused of rape while incarcerated; (3) that Mr. Bowers "had been cleared of all wrongdoing" regarding the rape allegation; and (4) that the prosecutor was still uncertain about whether or not Mr. Bowers would testify at trial. Defendant asserts that these representations were "grossly factually inaccurate and highly misleading." On February 6, 2009, General Housel brought her file to a meeting with defense counsel and gave defense counsel the opportunity to look through and copy any or all of the file. On February 9, 2009, the first day of trial, defense counsel orally moved the trial court to grant a continuance to allow defense counsel to investigate Mr. Bowers. The trial court denied the request and allowed defense counsel to question Mr. Bowers in a jury-out hearing on the second day of trial. During the jury-out hearing, Mr. Bowers testified that the reason he came forward was because he remembered "back when [he] was selling drugs. The same thing could have happened to [him] and [he] was thinking about what [his] family would have went [sic] through." Mr. Bowers testified that he had not been promised anything by the State and that he had nothing to gain from testifying against Defendant. He also testified about his prior convictions.

Defendant contends that the State failed to disclose information contained in its file that Mr. Bowers had been accused of participating in a brutal attack on a fellow inmate, Jon Plew. Defense counsel testified at the motion for new trial hearing that had he known about the allegations against Mr. Bowers, he would have attempted to impeach him and challenge his representation that he came forward against Defendant out of concern for the victim's family. Defendant contends that the State also failed to disclose information contained in its file that Mr. Bowers hoped to gain favor at a resentencing hearing based on his cooperation with the State pursuant to Federal Rule of Criminal Procedure 35(b). Defendant introduced as an exhibit at the motion for new trial hearing transcripts from Mr. Bowers' resentencing hearing, at which Mr. Bowers testified as to several instances in which he provided assistance to the government in hopes of receiving a reduced sentence. At the resentencing hearing in the U.S. District Court, the court found that Mr. Bowers was undeserving of any relief.

We conclude that Defendant has satisfied the first prong of the *Brady* inquiry. It is undisputed that Defendant made a discovery request for any exculpatory evidence in the State's possession. Defendant also specifically requested the substance of

any statement made by Defendant to another person whom the State anticipated calling as a witness. It is also clear that the evidence presented by Defendant at the hearing on his motion for new trial would have been favorable to him at trial. Evidence that Mr. Bowers had offered testimony in several prosecutions in exchange for consideration of a reduced sentence, as well as evidence regarding Mr. Bowers' involvement in the alleged beating of Mr. Plew in prison could have been used by Mr. Gross to impeach Mr. Bowers.

Regarding whether the State suppressed this information, the State asserts that Defendant presented no evidence that the State purposefully withheld information regarding Mr. Bowers. We agree. At the hearing on Defendant's motion for new trial, General Housel testified that it was "open file discovery" and she gave defense counsel "the opportunity to look and copy and distribute anything that he wanted in the file." She denied knowledge that Mr. Bowers had testified favorably for the prosecution in other cases, except one in which another Assistant District Attorney accompanied her to meet with Mr. Bowers, and Mr. Gross testified that he had listened to that interview prior to Mr. Bowers' testimony. General Housel also denied that she promised any consideration to Mr. Bowers for his testimony, explaining that the she did not believe there was anything she could do to assist Mr. Bowers. In fact, Mr. Bowers did not receive any consideration by the State in exchange for his testimony in this case other than "a good word" from General House. General Housel also testified that if she had any additional exculpatory information regarding Mr. Bowers, she would have provided it to defense counsel, and Mr. Gross testified that he believed General Housel was forthcoming and disclosed all the information about Mr. Bowers that the State had in its possession. Defendant has not shown that the prosecution had any of the "undisclosed" information presented at the motion for new trial hearing in its possession prior to trial. Therefore, Defendant has failed to establish the second prong of *Brady*.

In order to establish that the information was material, Defendant must show that there is a reasonable probability that had the evidence been disclosed to the defense, the results of the proceeding would have been different. *Kyles*, 514 U.S. at 434. We conclude that the evidence presented by Defendant at the motion for new trial hearing was not material. General Housel testified that she did not intend to call Mr. Bowers as a witness not only because of the accusations against him, but also because she did not perceive his testimony to be necessary to prove the State's case. She testified that the State's case was strong without Mr. Bowers' testimony based on Defendant's own statement to investigators, which was inconsistent with the evidence introduced at trial. Mr. Gross also acknowledged that the key prosecution witnesses were the medical examiner and firearms expert. We agree. Defendant has failed to show that there is a reasonable probability that impeaching Mr. Bowers with the information presented at the motion for new trial hearing would have changed the outcome of his trial.

Because all four *Brady* factors must be established in order to afford Defendant relief, and we have concluded that Defendant has failed to establish two of the factors, Defendant is not entitled to relief on this issue.

(*Id.* at 9–13.)

13

The state court thus concluded that, although favorable evidence about Bowers had been requested by Petitioner, the evidence in question had not been suppressed by the prosecution and was not material to the outcome of Petitioner's trial. Because the state court accurately identified and summarized the applicable federal standard under *Brady*, Petitioner can only prevail on this claim by establishing that the state court's application of *Brady* was objectively unreasonable or based on an unreasonable determination of fact.

But the Court has reviewed the transcript of the hearing on Petitioner's motion for new trial and finds that both the prosecutor's testimony and trial counsel's testimony confirm that the state disclosed all the information in its possession about Bowers before Bowers testified through verbal conversations, a recording of the prosecutor's interview with Bowers, and access to the prosecution's file. (*See* Doc. No. 15-13 at 9–10, 23, 26–27, 30; Doc. No. 15-14 at 38, 45, 47, 56, 63.) That information included the fact that Bowers had been suspected of involvement in an assault on a fellow inmate but had been cleared of wrongdoing. It also included evidence that Bowers was in discussions with another state prosecutor about the possibility of testifying in another state criminal case. It did not include any deal for leniency for Bowers, because he was a federal prisoner to whom the state prosecutor had nothing to offer, particularly given that Bowers's federal sentencing was final before he testified in this case. And it did not include information about Bowers's seeking reductions in his federal assistance based on substantial assistance he provided in other cases, because that information was not in the possession of the state prosecution team. Accordingly, the state court's determination that the prosecution did not suppress any evidence pertaining to Bowers was not unreasonable.

Likewise, the state court's additional finding that the evidence in question was not material was also not unreasonable. Petitioner acknowledged having shot the victim, so the crucial question

14

for the jury was whether he shot in self-defense, as he claimed. Bowers provided testimony that the prosecutor acknowledged was the "icing on the cake" to defeat the self-defense theory (Doc. No. 15-14 at 62), which might have been mitigated by the additional impeachment evidence in question. But Petitioner's self-defense claim was also disproved by the close range of the second shot to the victim's head, the lack of shell casings or bullet holes that would have been present if the victim had fired his own weapon, and the fact that Petitioner stole the victim's property after killing him. Accordingly, Bowers's testimony was helpful to the prosecution, but it was far from the only evidence against Petitioner.

Moreover, defense counsel did impeach Bowers with his criminal record and argued to the jury that he was not a credible witness based on that record and on the likelihood that he would use his cooperation in this case to seek a reduction in his own sentence. (Doc. No. 15-8 at 129–33.) Counsel might have done even more damage with the additional information—not known to the prosecution—that Bowers had an extensive history of cooperating in other federal cases in an effort to reduce his federal sentence. (*See* Doc. No. 15-15 at 32, Bowers Sentencing Position in Case No. 3:00-cr-00075.) But the other evidence against Petitioner would have remained strong even if counsel had impeached Bowers's credibility more than he did. The state court's determination that there was not a reasonable probability that Petitioner would have been acquitted if he had the additional impeachment evidence against Bowers was not unreasonable.

Petitioner is not entitled to relief on Claim 1.

## B. Claims 2–4 — Ineffective Assistance

As an alternative to Claim 1, Petitioner alleges in Claims 2 through 4 that trial counsel was ineffective for failing to take advantage of the prosecutor's offer to review and copy the information in her file about Bowers, to investigate and learn on his own the same information

15

about Bowers, and to impeach Bowers at trial. (Doc. No. 1 at 8–11.) He exhausted these claims in his state post-conviction proceedings.

All federal claims of ineffective assistance of counsel are subject to the highly deferential two-prong standard of *Strickland v. Washington*, 466 U.S. 668 (1984), which asks: (1) whether counsel was deficient in representing the defendant; and (2) whether counsel's alleged deficiency prejudiced the defense so as to deprive the defendant of a fair trial. *Id.* at 687. To meet the first prong, a petitioner must establish that his attorney's representation "fell below an objective standard of reasonableness," and must overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that . . . the challenged action 'might be considered sound trial strategy.'" *Id.* at 688, 689. The "prejudice" component of the claim "focuses on the question of whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993). Prejudice, under *Strickland*, requires showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

The Supreme Court has further explained the *Strickland* prejudice requirement as follows:

In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. Instead, *Strickland* asks whether it is "reasonably likely" the result would have been different. This does not require a showing that counsel's actions "more likely than not altered the outcome," but the difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters "only in the rarest case." The likelihood of a different result must be substantial, not just conceivable.

16

*Harrington v. Richter*, 562 U.S. 86, 111–12 (2011) (internal citations omitted). "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Strickland*, 466 U.S. at 697.

As discussed above, however, a federal court may not grant habeas relief on a claim that has been rejected on the merits by a state court, unless the petitioner shows that the state court's decision "was contrary to" law clearly established by the United States Supreme Court, or that it "involved an unreasonable application of" such law, or that it "was based on an unreasonable determination of the facts" in light of the record before the state court. 28 U.S.C. § 2254(d)(1) and (2); *Williams v. Taylor*, 529 U.S. 362, 412 (2000). Thus, when an exhausted claim of ineffective assistance of counsel is raised in a federal habeas petition, the question to be resolved is not whether the petitioner's counsel was ineffective. Rather, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Harrington v. Richter*, 562 U.S. at 101. As the Supreme Court clarified in *Harrington*,

> This is different from asking whether defense counsel's performance fell below *Strickland*'s standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

*Id.* (internal quotation marks and citation omitted).

The Tennessee Court of Criminal Appeals accurately identified and explained the *Strickland* standard for federal ineffective-assistance claims and rejected Petitioner's claims on the

merits:

The Petitioner argues that trial counsel was deficient in not investigating Mr. Bowers before he testified at trial. He further argues that trial counsel's cross-examination of Mr. Bowers "caused the defense more harm than would have no cross-examination at all." The Petitioner relies on *Peoples v. Lafler*, 734 F.3d 503 (6th Cir. 2013), for his apparent assertion that trial counsel's failure to impeach Mr. Bowers was per se ineffective assistance of counsel. However, the facts in *Lafler* greatly differ from those of the instant case. In *Lafler*, trial counsel was given a police report and other supporting documentation showing that two of that defendant's accomplices were lying about a particular fact of the crime, and trial counsel did not ask them about that fact or apparently even mention it in opening statement or closing argument. Further, the *Lafler* court specifically noted that trial counsel's whole strategy was to cast doubt on the credibility of the two accomplices, and his failure to impeach the two accomplices was therefore particularly harmful to the defense, even more so because the two accomplices' testimony was the only evidence linking that defendant directly to the actual crime. *Lafler*, 734 F.3d at 507, 513.

The Petitioner fails to recognize the important differences between *Lafler* and the instant case. As we have laid out, the post-conviction court found that trial counsel's failure to investigate Mr. Bowers did not prejudice him. The record supports such a conclusion. Although trial counsel did not impeach Mr. Bowers' claim that he was testifying because it was the right thing to do, he did reference his previous drug convictions and criminal history and during closing argument he portrayed Mr. Bowers as a "snitch and a liar" and told the jury not to be surprised if he sought a reduction in sentencing in exchange for his testimony. Further, although the Petitioner argues that trial counsel "actively worked to bolster the credibility of the prosecution's key witness[,]" the Petitioner ignores trial counsel's portrayal of Mr. Bowers as a "snitch and a liar" and his mentioning to the jury that it was possible Mr. Bowers would seek a reduction in his sentencing. Unlike the *Lafler* case, Mr. Bowers' testimony was not the only evidence the State possessed against the Petitioner, and Mr. Bowers received no actual benefit from his testimony, unlike the accomplices in *Lafler*. Although trial counsel might not have investigated Mr. Bowers as thoroughly as [the attorney who testified as an expert on non-deficient representation,] Ms. Morris[,] suggested he should have, there is nothing in the record to suggest that the jury accredited Mr. Bowers' testimony or that the jury would have decided differently had trial counsel impeached Mr. Bowers in a different manner.

Finally, the Petitioner argues that the State's other evidence against him would not have been sufficient to sustain his conviction without Mr. Bowers' testimony, namely because the Petitioner's assertion that he acted in self-defense would not have been contradicted. However, as we have laid out, despite the Petitioner's claim to detectives that he shot the victim in self-defense after the victim first fired a shot at him, there is no evidence that anyone but the Petitioner fired a gun. Further, the medical examiner, Dr. Deering, testified that the first shot to the victim was made from between six inches and two feet away, while the second, fatal shot was made

18

from only six inches away, demonstrating that the Petitioner moved closer to the victim after the first shot, just as he stated to detectives. Dr. Deering testified that it was possible the first shot knocked the victim unconscious. Thus, the only evidence supporting the Petitioner's claim of self-defense is his own assertion. We agree with the post-conviction court's conclusion that the Petitioner did not suffer prejudice as a result of trial counsel's failure to impeach Mr. Bowers.

(Doc. No. 15-55 at 16–17.)

The state court thus found that Petitioner's ineffective-assistance claims regarding the Bowers testimony failed on the second prong of *Strickland*, because counsel's allegedly deficient performance did not prejudice Petitioner. This Court has already found above, in connection with Petitioner's *Brady* claim, that a conclusion that there was no reasonable likelihood that additional impeachment of Bowers would have resulted in a different outcome at trial was not unreasonable. The same is true in the context of his ineffective-assistance claims.

Because the state court's rejection of these claims was not unreasonable, Petitioner is not entitled to relief under AEDPA.

## C. Claim 5 — Ineffective Assistance at Suppression Hearing

Petitioner alleges that his trial counsel was ineffective for failing to present Petitioner's testimony at the suppression hearing to prove that he was not free to leave during his interview and that his statement was thus obtained in violation of the Fourth Amendment. (Doc. No. 1 at 12.) He exhausted this claim in his post-conviction proceedings, where the Tennessee Court of Criminal Appeals summarized the relevant testimony and affirmed denial of relief on the merits:

Trial counsel also testified regarding his actions during the suppression hearing. When asked why he did not call the Petitioner to testify regarding whether officers had illegally seized him, trial counsel stated that the Petitioner had declined to testify, even after trial counsel explained that the issue was "something [the Petitioner] was going to have to substantiate." Further, trial counsel stated that even if the Petitioner had testified at the suppression hearing, he did not believe the Petitioner would have testified that there was "any show of force by the police that compelled him to come to the police station" because he had never mentioned a show of force to trial counsel. Trial counsel explained that he chose to rely on the

19

videotape of the Petitioner's interview with police as substantive proof at the suppression hearing based on the Petitioner's unwillingness to testify. Trial counsel conceded that the Petitioner "changed his story" multiple times during his interview with police and even asserted that he had shot the victim twice in self-defense after the victim shot at him, though no other "bullet strikes or casings" were found at the victim's apartment. Trial counsel also conceded that "one of the big thing[s]" at the suppression hearing was that the Petitioner was both "allowed to leave during the interview to go down the hall" and to "leave after the interview."

. . .

At the November 9, 2015 post-conviction hearing, attorney Kathleen Morris gave expert testimony, over the State's objection, regarding how "non-deficient" defense counsel should operate. . . . She also stated that a non-deficient attorney would call his client to testify at a suppression hearing regarding whether his client was illegally seized by police.

. . .

Detective Wiser testified that he and Detective Windsor located the Petitioner in the parking lot of Ms. Hooten's apartment. Although he did not remember whether he put his hand on his gun, he stated that he had a gun on his hip "[a]s [officers] always do[,]" but that he typically d[idn't]" keep his hand on his gun. He testified that the Petitioner agreed to "voluntarily com[e] down to the police station for an interview" and that they transported the Petitioner to the police station after frisking him for weapons, as was "standard procedure." He further explained that although he could not remember exactly why they transported the Petitioner to the police station, it was "not uncommon" for them to give rides to people who needed to go to the police station, "like a courtesy." Detective Wiser further affirmed that his interaction with the Petitioner was not hostile, but was a "civil conversation . . . [t]here w[eren't] any direct commands, or nothing [] like that."

The Petitioner also testified at the December 15, 2015 hearing. He testified that Detective Wiser "reached for his gun" when he and Detective Windsor approached the Petitioner in the parking lot of Ms. Hooten's apartment. He stated that the detectives would not allow him to go back to his apartment to tell "the kids" he was leaving, called for a police car, and "never gave [him] [the] choice" to walk away from them. The Petitioner further testified that he "never left custody" of the detectives after getting in the police car, though he affirmed he was not handcuffed. He stated that he relayed this information to trial counsel, and he responded, "Not that I recall" when asked whether trial counsel talked to him about testifying at the suppression hearing. On cross-examination, the Petitioner affirmed that trial counsel had "done his homework" and presented a recently-decided case at the suppression hearing that was similar to the Petitioner's.

. . .

The Petitioner also argues that trial counsel was ineffective in failing to present proof at the motion to suppress hearing that the Petitioner was seized by detectives. Although the Petitioner asserts that trial counsel never talked to him about testifying

at the suppression hearing, trial counsel testified that he told the Petitioner that this was an issue that would have required the Petitioner's testimony in light of the other evidence, namely the video of the Petitioner's interview and subsequent confession and the testimony of detectives. Trial counsel testified that the Petitioner elected not to testify at the suppression hearing, and trial counsel was thus forced to rely on the other available evidence to support the argument that the Petitioner's confession should have been suppressed. He further testified that the Petitioner never discussed with him that detectives had used force. Instead, trial counsel affirmed that the video of the Petitioner's interview showed that he was not handcuffed and was allowed to leave the room and walk down the hall during the interview.

Contrary to the Petitioner's testimony at the post-conviction evidentiary hearing that Detective Wiser approached him with his hand on his gun, Detective Wiser testified that he did not remember having his hand on his gun and would have only done so in a dangerous situation, and Detective Wiser affirmed that his interaction with the Petitioner had been civil, not threatening. Detective Wiser also testified that Detective Windsor had spoken to the Petitioner about voluntarily coming to the police station to be interviewed. He also affirmed that it was not unusual for them to provide transportation to the police station to witnesses or victims. Further, Detective Wiser stated, and the Petitioner conceded, that the Petitioner had not been handcuffed in the patrol car or during the interview. Instead, he had been allowed to leave the interview and walk down the hall by himself.

Except for the Petitioner's own assertions, there is nothing in the record to support a finding that he was seized by detectives. In fact, even without any strong evidence, trial counsel argued for suppression and presented a recently-decided case in support of the Petitioner. Although he was not able to keep the Petitioner's confession out, he was able to keep graphic photographs of the victim's bullet wounds out. Trial counsel testified that the Petitioner was unwilling to testify at the suppression hearing, despite his explanation of the necessity of doing so. Without the Petitioner's testimony, trial counsel lacked the evidence necessary to present proof that the Petitioner was seized. It is true that had the Petitioner's confession been suppressed, the State would have had a weaker case and, as Ms. Morris suggested, trial counsel would have been deficient if he unilaterally decided that the Petitioner would not testify at the suppression hearing. However, the post-conviction court accredited the testimony of trial counsel and the detectives over that of the Petitioner. The record suggests that trial counsel would have called the Petitioner to testify at the suppression hearing had he been willing, but even so, the testimony of the detectives and of trial counsel suggest that the Petitioner was not seized, regardless of whether or not he testified at the suppression hearing. Further, this court noted on direct appeal that the Petitioner had conceded that he voluntarily met with the detectives at the police station. *See State v. James Allen Pollard*, 2012 WL 4142253, at *13. The Petitioner fails to establish that trial counsel's performance was deficient or that he suffered prejudice as a result of the alleged deficiency.

(Doc. No. 15-55 at 11–14, 17–18.)

The state court thus found that this claim failed on both prongs of *Strickland*. Its finding that counsel's performance was not objectively deficient was based on its determination that counsel credibly testified that Petitioner refused to testify at the suppression hearing even after counsel explained to him that testimony was needed to support his effort to suppress his statement. Witness credibility assessments are "predominately the business of trial courts," and "federal habeas courts do not have license, under § 2254(d), to redetermine witness credibility, whose demeanor is observed exclusively by the state court." *Givens v. Yukins*, 238 F.3d 420 (Table), 2000 WL 1828484, at *10 (6th Cir. Dec. 5, 2000) (citing *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983)). The Court finds no basis in this record to conclude that the state court's credibility determination—and the consequent holding that counsel's performance was not deficient—was unreasonable.

A similar credibility determination underlies the state court's conclusion that Petitioner was not prejudiced by the failure to offer his own testimony at the suppression hearing. Petitioner's testimony that he was in custody involuntarily when he gave his statement was contradicted by Detective Wiser's testimony and by the video recording showing that Petitioner was able to get up and leave the room during the interview and leave by himself after the interview. The state court essentially found that Detective Wiser's testimony was more credible than Petitioner's and that Petitioner's statement would not have been suppressed even if he had testified at the hearing. Petitioner does not offer any basis for this Court to find that conclusion so unreasonable that it is beyond debate.

The state court's disposition of this claim was not unreasonable, and Petitioner is not entitled to relief under AEDPA.

**D.  Claim 6 — Cumulative Effect of Ineffective Assistance**

Petitioner alleges that the cumulative effect of counsel's alleged ineffectiveness deprived him of a fair trial. (Doc. No. 1 at 12.)  He exhausted this claim in post-conviction proceedings, and the state court rejected it on its merits:

> The Petitioner requests this court to consider the cumulative effect of the errors he has alleged above in deciding whether to grant him relief in this post-conviction appeal. Because we have found no single instance wherein trial counsel was deemed ineffective, there is no basis to conclude that any cumulative error resulted in an unfair trial.

(Doc. No. 15-55 at 19.)

This claim fails on habeas review for at least two reasons.  First, cumulative-error claims are not cognizable on habeas review because the Supreme Court has never held that cumulative errors may form the basis for issuance of a writ of habeas corpus. *Sheppard v. Bagley*, 657 F.3d 338, 348 (6th Cir. 2011); *Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002).  And second, the state court held that trial counsel did not commit any constitutional error in his representation of Petitioner, and this Court has found those rulings to be reasonable.  Accordingly, there are no instances of ineffectiveness that could have had a cumulative effect on the outcome of Petitioner's case.  Petitioner is not entitled to relief on this claim.

**E.  Claim 7 — *Miranda* Violation**

Petitioner alleges that his incriminating statement was obtained in violation of his rights under the Fifth and Fourteenth Amendments as defined by *Miranda v. Arizona*, 384 U.S. 436 (1966).  As indicated above, that claim was the focus of a suppression hearing before trial and was exhausted on direct appeal.  The state court rejected the claim on the merits:

> Defendant asserts that the trial court erred by denying his motion to suppress his statement to detectives. Specifically, Defendant contends that . . . he was subjected

23

to the functional equivalent of a custodial interrogation before he waived his *Miranda* rights, and therefore, his entire statement, including his post-waiver statement, should have been suppressed.

. . .

The Fifth Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment, provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." In *Miranda v. Arizona*, 384 U.S. 436 (1966), the United States Supreme Court concluded that in the context of "custodial interrogation" certain procedural safeguards are necessary to safeguard this privilege against compulsory self-incrimination. *Id.* at 444. More specifically, the Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Id.* Those safeguards include the now familiar *Miranda* warnings – namely, that the suspect be informed "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Id.* at 479. If the police fail to provide these warnings, any statement obtained as a result of custodial interrogation will not be admissible at trial during the prosecution's case-in-chief, even if the statement is otherwise voluntary. The *Miranda* Court was concerned that the "interrogation environment" created by interrogation and custody would "subjugate the individual to the will of his examiner" so as to undermine the privilege against compulsory self-incrimination. *Id.* at 457–58. In *Dickerson v. United States*, the United States Supreme Court reaffirmed that "*Miranda* and its progeny . . . govern the admissibility of statements made during custodial interrogation in both state and federal courts." 530 U.S. 428, 432 (2000); *see also State v. Walton*, 41 S.W.3d 75, 82 (Tenn. 2001). Consequently, if the defendant's statement resulted from custodial interrogation, the statement must be excluded from evidence because the police failed to provide the defendant *Miranda* warnings. *Oregon v. Elstad*, 470 U.S. 298, 307 (1985); *Walton*, 41 S.W.3d at 86.

*Miranda* defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444. Thereafter, the United States Supreme Court has explained that "interrogation" refers not only to express questioning but also to any words, actions, or practices that the police should know are reasonably likely to elicit incriminating information from a suspect. *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980); *see also Walton*, 41 S.W.3d at 85.

The disputed issues in this appeal are: (1) whether Defendant was "in custody" during the first seven minutes of the interview before he waived his *Miranda* rights; and (2) whether the detectives' words and conduct prior to the *Miranda* warnings were the functional equivalent of an interrogation, rendering subsequent confession inadmissible. To resolve this issue, we consider "whether, under the totality of the

Case 3:20-cv-00017   Document 26   Filed 05/18/20   Page 24 of 33 PageID #: 5317

circumstances, a reasonable person in the suspect's position would consider himself or herself deprived of freedom of movement to a degree associated with a formal arrest." *State v. Anderson*, 937 S.W.2d 851, 855 (Tenn. 1996). This test is "objective from the viewpoint of the suspect, and the unarticulated, subjective view of law enforcement officials that the individual being questioned is or is not a suspect does not bear upon the question." *Id.* Factors relevant to this objective assessment include:

> the time and location of the interrogation; the duration and character of the questioning; the officer's tone of voice and general demeanor; the suspect's method of transportation to the place of questioning; the number of police officers present; any limitation on movement or other form of restraint imposed on the suspect during the interrogation; any interactions between the officer and the suspect, including the words spoken by the officer to the suspect, and the suspect's verbal or nonverbal responses; the extent to which the suspect is confronted with the law enforcement officer's suspicions of guilt or evidence of guilt; and finally, the extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will.

*Id.*

Defendant concedes that he voluntarily met with police. It is unclear from the record how Defendant was transported to the interview. At the hearing on Defendant's motion to suppress, Detective Wiser could not recall whether Defendant transported himself or whether he was transported in a patrol car; however, at trial, Detectives Wiser and Windsor both testified that they believed that Defendant was transported to the interview in a police car.

The videotaped recording of Defendant's interview on July 14, 2006, is the most helpful piece of evidence regarding this issue. According to the counter on the video, at 14:38:20, or 2:38 p.m., Detective Windsor entered the interview room in which Detective Wiser is seated across a table from Defendant. Both detectives sat across the table from Defendant. Detective Windsor was closest to the door, which was across the table from Defendant, and the door was closed during the interview. Defendant was not handcuffed or restrained. Defendant did not ask or attempt to leave the room. Detective Windsor is clearly armed with a holstered handgun. The detectives spoke to Defendant in a casual and conversational tone. Detective Windsor acknowledged that Defendant was "nervous" and suggested that Defendant "relax." Detective Wiser then acknowledged that withholding information is "a heavy burden" and encouraged Defendant to tell the truth. Detective Wiser stated that they knew what happened but that they needed to know "the particulars." Detective Windsor stated that they knew that the victim owned a gun. Detectives then explained to Defendant that they believed that his co-defendant lied to them in order to protect Defendant but that she had finally admitted to them what had happened. The detectives stated that they knew that Defendant had gone to the victim's apartment to buy "a small amount of dope," and Detective Windsor speculated that the victim was armed and Defendant felt

threatened. Detective Windsor also stated that unless Defendant explained otherwise, they would have to assume that this was "a cold-blooded killing." At 14:45:35, Detective Wiser told Defendant that he would read Defendant his rights before they took Defendant's statement, and Defendant nodded affirmatively. Detective Wiser then read Defendant's *Miranda* rights and Defendant signed a waiver form. Thereafter, Defendant told the detectives that he shot the victim in self-defense during a struggle, and Defendant acted out his version of the events. Defendant admitted to having taken the victim's gun, cell phone, and PlayStation.

Defendant analogizes the facts of this case to those in *State v. Dailey*, 273 S.W.3d 94 (Tenn. 2009), in which the Tennessee Supreme Court determined, based on the totality of the circumstances, that the interrogation of the defendant Dailey was custodial. In its order denying Defendant's motion to suppress, the trial court distinguished the facts in this case from those in *Dailey* and found:

> This case is different from *Dailey*. The defendant was not asked questions prior to being read his *Miranda* rights. For approximately 7 minutes, the detectives in a casual conversational tone spoke with defendant Pollard about their discussions with the [co-defendant]. During this approximate 7 minutes timeframe, the detectives did the talking and did not ask defendant Pollard any questions. There was a continual flow of conversation and then the detectives informed the defendant of his *Miranda* rights before any questions were asked. The defendant affirmatively waived his *Miranda* rights. Furthermore, this interview was one continuous interview not two separate interrogations.

Defendant also cites *State v. Northern*, 262 S.W.3d 741, 750 (Tenn. 2008), in which our supreme court held that "[t]he functional equivalent of express questioning refers to 'any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" First, we agree with Defendant that the detectives['] statements and actions were intended to elicit an incriminating response from him. Therefore, unlike the trial court, we conclude that the entire interview, including the pre-*Miranda* portion was an interrogation, even though detectives did not ask specific questions of Defendant before giving the *Miranda* warning. However, as discussed below, we conclude under the totality of the circumstances in this particular case that Defendant was not in "custody" at anytime prior to the *Miranda* warning being given.

Defendant is also correct that the facts in *Dailey* are very similar to the facts of this case; however, there are some notable differences. In *Dailey*, "[t]he character of the questioning was accusatory and demanding[.]" In this case, the detectives were not accusatory or demanding and their demeanor was not threatening, although their statements to Defendant were "aimed at convincing the Defendant that the police already had sufficient evidence to convict him of murdering the victim and that he had to give them an explanation." *See Dailey*, 273 S.W.3d at 103. The most notable difference between *Dailey* and this case is that Dailey did not waive his *Miranda* rights until after he had confessed to killing the victim.

In fact, in all of the cases relied upon by Defendant, law enforcement gave *Miranda* warnings after the defendants had already confessed. Defendant urges this Court to employ the analysis set forth in *Missouri v. Siebert*, [sic] 542 U.S. 600 (2004), in which a divided Supreme Court addressed the two-step interrogation process in which police question first and warn later. The plurality opinion set forth several factors used to determine whether the "late *Miranda* warnings are effective." This same analysis was employed by the Tennessee Supreme Court in *Dailey* and *Northern*. However, we need not apply this analysis because, as noted below, unlike in these cases, Defendant did not make any pre-warning statements to detectives.

Defendant asserts that "the lengthy pre-*Miranda* interrogation, in which he made multiple admissions, violated his right against self-incrimination and the post-*Miranda* statement is the fruit of that poisonous earlier interview (and of the illegal seizure)." We disagree. Defendant contends that he made several pre-*Miranda* admissions during the "lengthy" seven-minute pre-*Miranda* interview. Specifically, Defendant asserts that he agreed with the detectives' statements that he was present in the victim's house, that he had a gun, that he didn't know the victim very well, and that the victim felt threatened by Defendant. Defendant does not cite where in the record these admissions are found, but we have to assume that he is referring to the videotaped interview, which actually shows that Defendant did not make any verbal statements to detectives before his *Miranda* warnings. Although it is difficult to discern from the downward angle of the video, Defendant may have nodded his head in response to some of the detectives' statements, but we do not interpret a slight nod of Defendant's head to mean that he agreed with the detectives' statements, and we certainly do not interpret it as an affirmative admission.

The first seven minutes of the interview consists of the detectives talking to Defendant in a non-threatening manner and Defendant having little or no response. As the trial court found in its order denying Defendant's motion to suppress, the detectives did not question Defendant prior to giving *Miranda* warnings. Further, Defendant did not speak about the incident until after he waived his *Miranda* rights. Defendant's entire confession, in which he reenacted a struggle between himself and the victim, was made after he waived his *Miranda* rights. We do not believe the detectives in this case used questionable tactics to coerce an involuntary statement from Defendant. As both detectives testified, they attempted to make Defendant feel comfortable and at ease in the hopes of obtaining his confession. Detective Windsor acknowledged that some of his statements to Defendant were deceptive, but they were intended to elicit a response from Defendant. We have already determined that the pre-warning portion of the interview was an interrogation. However, Defendant made no incriminating response prior to the *Miranda* warnings.

We also conclude that Defendant was not in custody during the pre-*Miranda* portion of the interview. Defendant voluntarily met with detectives; Defendant was not restrained during the interview; Defendant never requested to leave the interview; and detectives were not accusatory or demanding in their tone or demeanor. In fact, after Defendant confessed to shooting the victim, detectives gave

27

Defendant a can of soda and left the room. Defendant drank the soda and then excused himself to the restroom, apparently unescorted. Again, however, we note that Defendant made no incriminating response prior to waiving his *Miranda* rights. In sum, because Defendant's entire confession was made after he voluntarily waived his *Miranda* rights, we conclude that the trial court did not err in denying his motion to suppress his statement.

(Doc. No. 15-19 at 15–20.)

The state court correctly observed that *Miranda* warnings are not required unless an individual is "in custody." *Miranda*, 384 U.S. at 444 ("[T]he prosecutor may not use statements ... stemming from *custodial* interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.") (emphasis added). The test for determining whether an individual is "in custody" for purposes of *Miranda* is objective: whether a reasonable person in the defendant's position, knowing the facts as the defendant knew them, would have felt that he was under arrest or was "otherwise deprived of his freedom in any significant way." *Id.* at 477. The factors considered by the state court include those considered by federal courts addressing *Miranda* claims: (1) location of the interview; (2) length and manner of questioning; (3) whether the individual's freedom of movement was restrained; (4) whether the individual was told he did not have to answer questions and statements made during questioning; and (5) whether the individual was released after the questioning. *Schreane v. Ebbert*, 864 F.3d 446, 452 (6th Cir. 2017) (citing *Howes v. Fields*, 565 U.S. 499, 509 (2012)); *United States v. Hinojosa*, 606 F.3d 875, 883 (6th Cir. 2010). Even if another court might have reached a different conclusion after considering those factors, the state court's determination that Plaintiff was not in custody for the first seven minutes of his interview was not unreasonable. The court credited the officer's testimony to the effect that Petitioner agreed to the interview voluntarily and that there was nothing overtly hostile or demanding about the questioning, and Petitioner was never restrained or prevented from leaving on his own.

28

The state court also found that the warnings were given before Petitioner made any incriminating statements, thus distinguishing this case from *Missouri v. Seibert*, 542 U.S. 600 (2004), and two Tennessee cases applying the multi-factor test it announced. (Doc. No. 15-19 at 19.) In *Seibert*, a police officer questioned a suspect for thirty minutes, elicited a confession, then gave the suspect *Miranda* warnings and had her repeat the confession. The Supreme Court held that *Miranda* required the suppression of both the pre- and post-warning confessions and announced five factors to consider in determining whether to suppress the post-warning confession in such "*Miranda*-in-the-middle" situations. *Seibert*, 542 U.S. at 615. Those factors are: (1) the completeness and detail of the pre-warning questions and answers; (2) the overlapping content between the pre- and post-warning statements; (3) the timing and setting of both rounds of interrogation; (4) the continuity of police personnel during both rounds; and (5) the degree to which the interrogator's questions treat both rounds as a continuous interrogation. *See United States v. Maddox*, No. 1:18-CR-169-TRM-CHS, 2020 WL 896769, at *8 (E.D. Tenn. Jan. 29, 2020), *report and recommendation adopted*, No. 1:18-CR-169, 2020 WL 888516 (E.D. Tenn. Feb. 24, 2020) (citing *Seibert*, 542 U.S. at 615).

The state court found that Petitioner's case did not require suppression under *Seibert* because he did not make a pre-warning confession. Rather, the state court found that Petitioner "made no incriminating response" and did not even say anything about the incident until after the officer gave him the *Miranda* warnings. This Court has reviewed the video on which the state court based that factual determination and observed more verbal responses prior to the *Miranda* warnings than the state court acknowledged. At approximately 14:39:06 on the recording, in response to one of the detectives' commenting that Petitioner was nervous, he responded that he had never been arrested. (Doc. No. 19, "Interview" disc.) At around 14:40:47, when detectives

were discussing how many times they had interviewed Petitioner's girlfriend, he chimed in "five or six." (*Id.*) At 14:42:62, one of the detectives expressed an understanding that Petitioner was carrying a gun the day of the incident because Petitioner did not know the victim well, and Petitioner verbally agreed that he did not. (*Id.*) At 14:43:25, a detective said he did not believe that Petitioner had the gun out pointing it at the victim when he entered his home, and Petitioner said "no." (*Id.*) And at 14:43:41, very shortly before Petitioner was read his *Miranda* warnings, one of the detectives suggested that facing another person with a gun requires a difficult judgment call for someone who has not been in that situation, and Petitioner responded "exactly." (*Id.*) Those latter three responses by Petitioner arguably acknowledged that, at least at some point, he was in the victim's home with a gun. Another court might reasonably find that they constitute an incriminating pre-warning statement.

But not every pre-warning statement implicating a defendant in a crime requires suppression under *Seibert*. In *Bobby v. Dixon*, 565 U.S. 23 (2011), the defendant was originally arrested for forgery and acknowledged during pre-warning interrogation that he had obtained an identification card in a murder victim's name, signed his name to a check, and sold his car, but denied any involvement in his disappearance. *Dixon*, 565 U.S. at 25–26. Hours later, after learning that police had found the victim's body, the defendant volunteered to make a statement, was read and waived his *Miranda* rights, and gave a detailed confession to the murder. *Id.* at 26. The Supreme Court summarized the material details of *Seibert* and found it did not require suppression of the defendant's murder confession:

> In *Seibert*, police employed a two-step strategy to reduce the effect of *Miranda* warnings: A detective exhaustively questioned Seibert until she confessed to murder and then, after a 15- to 20-minute break, gave Seibert *Miranda* warnings and led her to repeat her prior confession. 542 U.S., at 604–606, 616 (plurality opinion). The Court held that Seibert's second confession was inadmissible as

evidence against her even though it was preceded by a *Miranda* warning. A plurality of the Court reasoned that "[u]pon hearing warnings only in the aftermath of interrogation and just after making a confession, a suspect would hardly think he had a genuine right to remain silent, let alone persist in so believing once the police began to lead him over the same ground again." 542 U.S., at 613; *see also id.*, at 615 (detailing a "series of relevant facts that bear on whether *Miranda* warnings delivered midstream could be effective enough to accomplish their object"). Justice KENNEDY concurred in the judgment, noting he "would apply a narrower test applicable only in the infrequent case . . . in which the two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning." *Id.*, at 622.

In this case, no two-step interrogation technique of the type that concerned the Court in *Seibert* undermined the *Miranda* warnings Dixon received. In *Seibert*, the suspect's first, unwarned interrogation left "little, if anything, of incriminating potential left unsaid," making it "unnatural" not to "repeat at the second stage what had been said before." 542 U.S., at 616–617 (plurality opinion). But in this case Dixon steadfastly maintained during his first, unwarned interrogation that he had "[n]othing whatsoever" to do with Hammer's disappearance. App. to Pet. for Cert. 186a. Thus, unlike in *Seibert*, there is no concern here that police gave Dixon *Miranda* warnings and then led him to repeat an earlier murder confession, because there was no earlier confession to repeat. Indeed, Dixon contradicted his prior unwarned statements when he confessed to Hammer's murder. Nor is there any evidence that police used Dixon's earlier admission to forgery to induce him to waive his right to silence later: Dixon declared his desire to tell police what happened to Hammer before the second interrogation session even began. As the Ohio Supreme Court reasonably concluded, there was simply "no nexus" between Dixon's unwarned admission to forgery and his later, warned confession to murder. 101 Ohio St.3d, at 333, 805 N.E.2d, at 1051.

Moreover, in *Seibert* the Court was concerned that the *Miranda* warnings did not "effectively advise the suspect that he had a real choice about giving an admissible statement" because the unwarned and warned interrogations blended into one "continuum." 542 U.S., at 612, 617. Given all the circumstances of this case, that is not so here. Four hours passed between Dixon's unwarned interrogation and his receipt of *Miranda* rights, during which time he traveled from the police station to a separate jail and back again; claimed to have spoken to his lawyer; and learned that police were talking to his accomplice and had found Hammer's body. Things had changed. Under *Seibert*, this significant break in time and dramatic change in circumstances created "a new and distinct experience," ensuring that Dixon's prior, unwarned interrogation did not undermine the effectiveness of the *Miranda* warnings he received before confessing to Hammer's murder. 542 U.S., at 615; *see also id.*, at 622 (KENNEDY, J., concurring in judgment) ("For example, a substantial break in time and circumstances between the prewarning statement and the *Miranda* warning may suffice in most circumstances, as it allows the accused to distinguish the two contexts and appreciate that the interrogation has taken a new turn").

*Dixon*, 565 U.S. 23, 30–32 (2011).

The case at hand is similar to *Seibert* in that Petitioner's entire interrogation was a single continuous event, in the same place, with the same police personnel. However, it is also similar to *Dixon*, in that Petitioner's pre-warning comments—although arguably implicating him in the murder, much like Dixon's confession to forgery implicated him in his victim's disappearance—did not include a full-blown confession to homicide. Moreover, the detectives did not rely on Petitioner's pre-warning comments to extract additional information from him post-warning, and there is nothing to indicate that they were intentionally employing an ask-now-warn-later strategy; in fact, they did not ask any questions at all prior to Petitioner's *Miranda* waiver. And finally, the state court's determination that Petitioner was not in custody at the time he made his pre-warning incriminating statements, which this Court has already found to be reasonable, apparently precludes Petitioner's *Seibert* argument. *See United States v. Evans*, No. 18-20421, 2019 WL 458165, at *7 (E.D. Mich. Feb. 6, 2019) ("Because the pre-*Miranda* questioning was non-custodial, the *Seibert* midstream *Miranda* warning test does not apply."); *see also United States v. Ray*, 690 F. Appx 366, 371 (6th Cir. 2017) (finding that first statement was made during custodial interrogation, thus "triggering *Seibert*" analysis).

Reasonable jurists could easily debate whether *Seibert* required suppression of Petitioner's statement under these circumstances. Accordingly, the state court's determination that suppression was not required was not "objectively unreasonable" as required to grant relief under AEDPA, *Young v. Hofbauer*, 52 F. App'x 234, 236 (6th Cir. 2002), and Petitioner is not entitled to relief on this claim.

32

## VI.    CONCLUSION

Petitioner's habeas claims fail on their merits for the reasons set forth above.  Accordingly, the Court will deny the requested relief and dismiss the petition.

An appropriate Order will enter.

WILLIAM L. CAMPBELL, JR.
UNITED STATES DISTRICT JUDGE

33